The Honorable Steve Jones State Representative P.O. Box 3040 West Memphis, AR 72303
Dear Representative Jones:
You have requested an Attorney General opinion concerning Act 1185 of 1999 and Act 1155 of 1999. Your questions are as follows:
 (1) Is there a conflict between Section 1(c) of Act 1185 and Article 16, § 5 of the Arkansas Constitution?
 (2) Can the state enter into a contract for local government or a local elected office that is under the authority of the local Assessor (as permitted by Section 4(a)(3) of Act 1185)?
 (3) Under Sections 4(b) and (c) of Act 1185, will local Assessors be required to obtain prior state approval before executing their previously sworn duties as elected officials?
 (4) Can the legislature require elected officials to take a test as a prerequisite for doing the job that they have already been elected by the people to do [as required under Sections 4(d) (e)]?
 (5) Does Section 2 of Act 1155 of 1999 comply with Article 14, § 2 of the Arkansas Constitution?
RESPONSE
Question 1 — Is there a conflict between Section 1(c) of Act 1185 andArticle 16, § 5 of the Arkansas Constitution?
It is my opinion that there is not a conflict between Section 1(c) of Act 1185 and Article 16, § 5 of the Arkansas Constitution.
Article 16, § 5 of the Arkansas Constitution states in pertinent part:
 (a) All real and tangible personal property subject to taxation shall be taxed according to its value, that value to be ascertained in such manner as the General Assembly shall direct, making the same equal and uniform throughout the State. No one species of property for which a tax may be collected shall be taxed higher than another species of property of equal value[.]
Ark. Const., art. 16, § 5.
Section 1(c) of Act 1185 states:
 (c) The county assessor, or other official or officials designated by law, shall compare the assessed value of each parcel under a reappraisal or reassessment which is completed in 1999 or later to the assessed value of the parcel for the previous year. If the assessed value of the parcel increased, then the assessed value of the parcel for the year in which the parcel is reappraised or reassessed shall be adjusted by adding one-third (1/3) of the increase to the assessed value for the year prior to reappraisal or reassessment. An additional one-third (1/3) of the increase shall be added in each of the next two (2) years.
Acts 1999, No. 1185, 1(c).
Pub. Svc. Comm'n v. Pul. Co. Equalization Bd., 266 Ark. 64,582 S.W.2d 942 (1979) provides guidance in analyzing the constitutionality of Act 1185 of 1999. In that case, the court addressed the constitutionality of Act 188 of 1969 and Act 411 of 1973. Act 188 permitted agricultural and timberlands to be assessed for taxation on the basis of their current use, while all other land was to be assessed for taxation on the basis of market value. Act 411 effectively froze assessment values for some farm and timberlands at 1961 values and froze assessment values for some residential property at 1956 values. The court held the two acts to be unconstitutional violations of Article 16, § 5. In doing so, the court addressed two questions: (1) Whether the term "value," as used in Article 16, § 5 referred to "current use value," or "fair market value;" and (2) Whether the legislature may classify property with the result that one "species" of property is treated differently for taxation purposes than another "species" of property.
The court held that the term "value," as used in Article 16, § 5 refers to fair market value. The court also held that the legislature may not classify species of property and treat the species differently for taxation purposes.
Act 1185 differs from the acts that were under consideration in Pub.Svc. Comm'n v. Pul. Co. Equalization Bd. is that Act 1185 uses fair market value as its standard. Under Act 1185, all property is to be reappraised for the purpose of determining the fair market value of the property for taxation purposes. Taxes for all property will be based upon the fair market value of the property being taxed, as required by Article 16, § 5, and as that constitutional provision was interpreted by the court in Pub. Svc. Comm'n v. Pul. Co. Equalization Bd., supra. The fact that Act 1185 authorizes phasing in the effects of an increase in fair market value over a period of years does not mean that fair market value is not being used as a basis for taxation of the property. Article 16, § 5 of the constitution unambiguously grants the legislature the authority to direct the manner in which valuation of property is to be ascertained. I believe that under this grant of authority, the legislature is empowered to utilize a phase-in system, provided that it is, in fact, based upon fair market value.
It is important to note that Section 15 of Act 1185 states:
 It is hereby found and determined by the General Assembly of the State of Arkansas that the ad valorem tax system in the state is of critical importance to the state and its citizens; that many property assessments in this state are erroneous and need to be revised; that in order to correct the erroneous assessments, each parcel or taxable property in each county of the state should [be] reviewed, and revalued, at a minimum of once every three (3) years; that the provisions of this act provide for such a review.
Acts 1999, No. 1185, § 15.
The General Assembly has found that many property assessments on the books at the time of the passage of Act 1185 were erroneous. Act 1185 was intended to be remedial. It attempts to correct error that currently exists regarding property assessments. By passing Act 1185, the General Assembly has addressed and attempted to correct a matter of critical importance to the state. It is my opinion that the General Assembly acted consistently with the constitution in doing so.
The Arkansas Supreme Court specifically approved a local attempt to correct inappropriate valuations in Rodgers v. Easterling, 270 Ark. 255,603 S.W.2d 884 (1980). In that case, the Hempstead County Equalization Board hired an appraisal firm to prepare a county wide reappraisal. It did so in an attempt to increase above 18% the average ratio of the assessed value of all property in the county to the actual value of the property as certified by the Public Service Commission's Assessment Coordination Division, so that turn-back funds withheld pursuant to law would be released to the county. The appraisal was not based on current market values. Taxpayers filed a lawsuit, seeking to have the reassessment based upon the appraisal declared illegal, and to require that taxes be based on the status quo that existed prior to the reappraisal (i.e., previous assessed values). The taxpayers' argument was that the reappraisal was illegal because it was not based on current market values, as required under the holding of the Pub. Serv. Comm'n.
case, supra. The court rejected the argument, stating:
 We think the 1979 reassessment in Hempstead County was an act taken to achieve a more proper level of taxation and, as such, was not illegal or contrary to the decision of this court in Arkansas Public Service Comm.
Easterling, supra, at 259.
It is my opinion that the taxation system that is created by Act 1185 is an attempt to achieve a more proper level of taxation. When Act 1185 is read in its entirety, it appears that the legislature has recognized that erroneous property value assessments cannot be fixed statewide in one year. The legislature chose a plan that phases in remedial action over a three year period. The effect of Act 1185 is to set out the basic methodology in which erroneous property assessments will be corrected. The General Assembly is specifically authorized by Article 16, § 5 to establish such methodology.
Finally, I must point out the well-established principle that legislative enactments are presumed to be constitutional, see Hall v. Tucker,336 Ark. 112, ___ S.W.2d ___ (1999); Boyd v. Weiss, 333 Ark. 684,971 S.W.2d 237(1998). The question of whether there is a conflict between Section 1(c) of Act 1185 and Article 16, § 5 of the Arkansas Constitution must ultimately be decided by a court. Pending such an ultimate judicial determination of this matter, it is my opinion that Act 1185 does not conflict with Article 16, § 5 of the Arkansas Constitution.
Question 2 — Can the state enter into a contract for local government ora local elected office that is under the authority of the local Assessor(as permitted by Section 4(a)(3) of Act 1185)?
It is my opinion that the state can enter into a contract for a local Assessor, as permitted by Section 4(a)(3) of Act 1195 of 1999.[1]
The reference in your question to "the state" is actually a reference to the Assessment Coordination Department, which is authorized under Section 4(a)(3) of Act 1185 to enter into contracts on behalf of counties for appraisal services. This grant of authority is not a departure from established law. The Assessment Coordination Department has long had authority over local assessors. This authority is explicitly stated in various statutory sections. For example, A.C.A. § 26-24-102 states:
 The Arkansas Public Service Commission[2] shall have the full power and authority in the administration of the tax laws of this state to have and exercise general and complete supervision and control over:
 (1) The valuation, assessment, and equalization of all property, privileges, and franchises;
(2) The collection of taxes; and
 (3) The several county assessors, county boards of review and equalization, tax collectors, and other officers charged with the assessment or equalization of property or the collection of taxes throughout the state, to the end that all assessments on property, privileges, and franchises in this state shall be made in relative proportion to the just and true value thereof, in substantial compliance with the law.
A.C.A. § 26-24-102.
Similarly (and more specifically), A.C.A. § 26-24-105 states:
 The Arkansas Public Service Commission[3] shall have the full power and authority in the administration of the tax laws of this state to confer with, advise, and direct all assessors, county boards of review and equalization, county judges, county clerks, and collectors of state and county taxes concerning their duty with respect to the revenue laws of this state.
A.C.A. § 26-24-105.
Moreover, any action or direction of the Assessment Coordination Department is binding on local assessors, as indicated by A.C.A. § 26-24-106, which states:
 (a) The Arkansas Public Service Commission[4] shall have the full power and authority in the administration of the tax laws of this state to answer all questions that may arise in the construction of any statute affecting the assessment, equalization, or collection of taxes, in accordance with the advice and opinion of the Attorney General.
 (b) Such opinion and the rules, regulations, orders, and instructions of the commission prescribed and issued in conformity therewith shall be binding upon all officers, who shall faithfully observe and obey the same unless and until they are reversed, annulled, or modified by a court of competent jurisdiction.
A.C.A. § 26-24-106.
Local assessors have not been granted the authority to operate outside the supervision and control of the state, now acting through the Assessment Coordination Department, nor have they ever been granted the authority to enter into contracts unilaterally. The duties of assessors are to be those that are "prescribed by law." See Article 7, § 46; A.C.A. § 14-14-1301(4). State law, as set forth in the statutory sections quoted above, prescribes that local assessors are to be under the direction and control of the Assessment Coordination Department. For this reason, I conclude that the Assessment Coordination Department has full authority to contract on behalf of local assessors.
Question 3 — Under Sections 4(b) and (c) of Act 1185, will localAssessors be required to obtain prior state approval before executingtheir previously sworn duties as elected officials?
Although it is not entirely clear what you are asking, your question seems to be based upon the idea that Act 1185 places upon assessors the requirement of obtaining approval to do something that they had already sworn to do. This is not an accurate interpretation of the duties of assessors. Before attempting to address your question, I will set forth the provisions of Act 1185 about which you have inquired. Sections 4(b) and (c) of the Act state:
 (b) Each county shall follow the reappraisal procedures established by the Department and file a reappraisal management plan with the Department no later than July 1 of the year preceding the commencement of reappraisal. The plan shall specify a proposed budget, personnel needs, and projected annual progress with respect to discovery, listing, and valuation of property.
 (c) The Department shall follow pre-established Department rules to determine whether a reappraisal management plan is approved or rejected.
Acts 1999, No. 1185, §§ (b) and (c).
The procedure prescribed by the above-quoted sections governs the reappraisals that are required by the Act to take place every three years. To the extent that assessors are involved in this reappraisal process, they must comply with this procedure.
When assessors swear to do their "duties" (see Arkansas Constitution, Article 19, § 20), they are swearing generally to do whatever the law prescribes for them to do. (As discussed previously in response to Question 2, local assessors must perform the duties that are "prescribed by law." See Arkansas Constitution, Article 7, § 46; A.C.A. §14-14-1301(4).) If state law prescribes duties for assessors that include obtaining state approval of a reappraisal management plan, then the "previously sworn duties" to which your question refers would entail the duty of obtaining that approval.
I understand that the real issue raised by your question is whether the legislature can require pre-approval of a duty that the assessors had previously been performing without such pre-approval. It is my opinion that the legislature, acting under its constitutional authority, can require such pre-approval. Article 16, § 5 of the Arkansas Constitution explicitly grants the legislature the authority to determine the manner by which property values are to be ascertained. The legislature therefore clearly has the authority to require that property values be ascertained by way of a process that entails the filing and approval of a reappraisal management plan.
Question 4 — Can the legislature require elected officials to take a testas a prerequisite for doing the job that they have already been electedby the people to do [as required under Sections 4(d) (e)]?
Sections 4(d) (e) of Act 1185 empower the Assessment Coordination Department to establish training, experience, and testing requirements that assessors and others must comply with in order to be qualified to manage the reappraisals that are required by the Act.
Although the legislature cannot add additional qualifications for elected constitutional officials, see Mississippi County v. Green, 200 Ark. 204,138 S.W.2d 377 (1940), it is my opinion that Sections 4(d) (e) of Act 1185 do not do this. These sections do not provide that assessors must take a test or comply with other requirements in order to perform the duties that are required of them by law. Arkansas law does not specify that the management of reappraisals is a duty of the assessor. Indeed, the management of reappraisals is a duty that traditionally is not performed by the assessor. For this reason, it is my opinion that the legislature can require assessors (and others) to comply with the Department's testing requirements before being permitted to manage a reappraisal under the Act. Sections 4(d) (e) simply provide that anyone (including assessors) who is to manage a reappraisal under the Act must comply with the Department's testing and other requirements. That person need not be the assessor.
Accordingly, I conclude that the testing and other requirements imposed by Sections 4(d) and (e) of Act 1185 of 1999 are constitutionally permissible.
Question 5 — Does Section 2 of Act 1155 of 1999 comply with Article 14,§ 2 of the Arkansas Constitution?
It is my opinion that Section 2 of Act 1155 of 1999 does not violate Article 14, § 2 of the Arkansas Constitution.
Section 2 of Act 1155 of 1999 requires that a certain amount of money be transferred from the Public School Fund to the Arkansas Real Property Reappraisal Fund, to help pay counties and professional reappraisal companies for the costs of reappraisal of real property for the biennial period ending June 30, 2001.
Article 14, § 2 of the Arkansas Constitution states:
2. School fund — Use — Purposes.
 No money or property belonging to the public school fund, or to this State for the benefit of schools or universities, shall ever be used for any other than for the respective purposes to which it belongs.
Ark. Const., art. 14, § 2.
The Arkansas Supreme Court most recently reiterated the test for compliance with Article 14, § 2, in Magnolia School Dist. 14 v. Ark. St.Bd. of Educ., 303 Ark. 666, 799 S.W.2d 791 (1990), stating "[A]ny use of school funds that results in benefits to school funds or property or aids in the stated purposes for which these funds may be expended would not be an unconstitutional diversion." Id. at 671, citing Rainwater v. Hays,244 Ark. 1191, 428 S.W.2d 254 (1968).
The Arkansas Supreme Court has never addressed the specific question of whether the use of monies from the Public School Fund to pay property appraisal costs violates Article 14, § 2. Nevertheless, it is helpful to review some of the uses of school funds that the court has held to be permissible.
For example, in Magnolia, quoted above, the court held that an appropriation of public school money to pay for the costs of desegregation, including attorneys' fees, did not violate Article 14, § 2, because it resulted in a benefit to public education. The court had reached a similar result in Board of Education of Lonoke County v. LonokeCounty, 181 Ark. 1046, 29 S.W.2d 268 (1930).
In Rainwater v. Hays, cited above in Magnolia, the court held that the use of school funds to pay municipal street improvement district assessments did not violate Article 14, § 2, because such payment resulted in benefits for the school. In its opinion, the Rainwater court reviewed the decisions in various other cases.
Most notable among these was Strawn v. Campbell, County Judge,226 Ark. 449, 291 S.W.2d 508 (1956). There, the court held that the use of school funds to pay for property appraisals did not violate Article 14, § 3, which prohibits the use of school funds for non-school purposes. Accord,County Bd. of Educ. v. Austin, 169 Ark. 436, 276 S.W. 2 (1925) (the use of school funds to pay the cost of collecting and disbursing taxes was permissible).
In addressing this issue, the Strawn court made the following statement, which is pertinent to several of the issues you have raised:
 The State Constitution clearly gives the General Assembly the authority to require the schools to pay their pro rata share of the costs of assessing property, a portion of which may be applied to the expenses of employing professional appraisers. This is a valid exercise of legislative power and is not prohibited by Amendment No. 40 to the State Constitution [Article 14, § 3]. The office of tax assessor must form a part of any valuation scheme erected by the General Assembly, but the General Assembly may, from time to time, prescribe the duties of that office and adopt such methods as may be deemed expedient to ascertain the values of taxable property. See Hutton v. King, 134 Ark. 463, 205 S.W. 296.
Strawn, 226 Ark. at 455.
The cases discussed above indicate that when faced with issues involving the use school funds, the court has tended to find a wide range of uses to be permissible, provided that some benefit to the schools can be found. The reappraisal of property upon the basis of which school districts will receive an increased income clearly is a benefit for the schools. In light of this fact, as well as the fact that the court specifically found in Strawn that the appraisal of real property was not an unconstitutional diversion under Article 14, § 3, I am persuaded that such a use of the Public School Fund likewise does not violate Article 14, § 2.
I also reiterate that until legislation has been challenged and stricken down by a court on constitutional grounds, it is presumed to be constitutional. Hall v. Tucker, 336 Ark. 112, ___ S.W.2d ___ (1999); Boydv. Weiss, 333 Ark. 684, 971 S.W.2d 237(1998).
Assistant Attorney General Suzanne Antley prepared the foregoing opinion, which I hereby approve.
Sincerely,
MARK PRYOR Attorney General
MP:SA/cyh
[1] Section 4(a)(3) of Act 1185 states:
 SECTION 4. (a) To carry out the provisions of this act, the [Assessment Coordination] Department shall, as it deems necessary, appropriate, and consistent with the objectives of this act:
* * *
 (3) Enter into contracts with private entities for appraisal services on behalf of counties on such terms and conditions as the Department deems are consistent with the provisions of this act and are necessary and appropriate in its implementation. Title 19, Chapter 11 of the Arkansas Code shall not apply to contracts made under this act and to the expenditure of funds from the Arkansas Real Property Reappraisal Fund.
Acts 1999, No. 1185, § 4(3).
[2] The Assessment Coordination Department was originally a division of the Arkansas Public Service Commission. See A.C.A. § 26-24-101. That Division was separated from the APSC by Act 436 of 1997 and now operates as a principle department, rather than as an arm of the APSC. Act 436 of 1997 states:
 (a) The Assessment Coordination Division of the Public Service Commission is transferred by a Type 2 transfer as provided in § 25-2-105 to the Assessment Coordination Department.
 (b) For purposes of this subchapter, the Assessment Coordination Department shall be considered a principal department established by Act 38 of 1971.
Acts 1997, No. 436, § 2.
The reference in A.C.A. § 26-24-105 can therefore reasonably be interpreted as a reference to the Assessment Coordination Department.
[3] See Footnote 2, supra.
[4] See Footnote 2, supra.